# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 13-3110

———————————————

Rollin J. Morehouse; Maureen B. Morehouse

*Appellant*s

v.

Commissioner of Internal Revenue

*Appellee*

——————————

Appeal from The United States Tax Court

——————————

Submitted: June 11, 2014
Filed: October 10, 2014

——————————

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

——————————

BEAM, Circuit Judge.

The Tax Court determined that payments received by Rollin and Maureen Morehouse under the United States Department of Agriculture's Conservation Reserve Program (CRP), 16 U.S.C. §§ 3801, 3831-35, constituted income from self-employment for purposes of 26 U.S.C. § 1401. We reverse.

## I. BACKGROUND

Morehouse[1] holds a bachelor's degree in business from the University of Minnesota. Following graduation he worked as a regional sales manager and as an associate publisher. From 1987 through 2003, Morehouse provided marketing and fundraising services for the University of Texas at Austin. In 2003, he moved his family to Minnesota and became the primary caretaker for his four sons.

In 1994, Morehouse inherited 503 acres of land in Grant County, South Dakota (Grant County Property), 320 acres in Roberts County, South Dakota (Roberts County Property), and 400 acres in Day County, South Dakota (Day County Property). All of the land was tillable cropland, with the exception of a gravel pit on the Grant County Property and 129 acres of the Roberts County Property, which Morehouse's father had placed in the CRP program. Morehouse never farmed any of the land, but instead rented portions of the properties to individuals who farmed their rented portions.

In 1997, Morehouse enrolled the tillable land on the Grant County Property and the remaining 191 acres of the Roberts County Property (collectively the "CRP Properties") in the CRP.[2] The Commodity Credit Corporation (CCC) executed the CRP contracts with respect to the CRP Properties. These contracts expressly forbade

---

[1]The Morehouses filed joint tax returns for 2006 and 2007 and were thus both liable for their alleged deficiencies in those years. However, only Rollin Morehouse's conduct is at issue and any references to "Morehouse" refer solely to him.

[2]The CRP was established pursuant to the Food Security Act of 1985. See Food Security Act of 1985, Pub. L. No. 99-198, §§ 1201-1236, 99 Stat. 1354, 1504-1514 (codified as amended at 16 U.S.C. §§ 3831-3835). The primary purpose of the CRP is to reduce soil erosion and improve soil conditions on highly erodible cropland. See 16 U.S.C. § 3801(a).

Morehouse from, among other things, producing agricultural commodities on the CRP Properties or undertaking "any action on the land . . . which tends to defeat the purposes of this CRP contract, as determined by the CCC."

The CRP contracts also required Morehouse to implement conservation plans for the CRP Properties. These plans generally required Morehouse to establish and maintain specific types of grass and legume or perennial vegetative cover on portions of the CRP Properties and periodically engage in weed and pest control.[3] Morehouse was also required to fulfill certain annual paperwork obligations and he visited the CRP Properties approximately three times each year to ensure the properties complied with the CRP contracts. In return for Morehouse's compliance with the CRP contracts, the CCC agreed to pay part of his costs for implementing the conservation plans, along with an "annual rental payment."

Morehouse received CRP payments of $37,872 in both 2006 and 2007. The Morehouses timely filed tax return forms for both years and identified their occupations as "self-employed." On Schedules E of their tax returns, the Morehouses listed the CRP payments for both years as "rents received," and thus the CRP payments were not taxed as self-employment income. On October 14, 2010, the Internal Revenue Service Commissioner (Commissioner) mailed to the Morehouses

---

[3]The dissenting opinion seems to indicate that Morehouse's compliance with the CRP contracts amounted to a full-scale farming operation, complete with hired hand. The record, however, indicates that Morehouse hired Wallace Redlin, who had previously cash rented portions of the CRP Properties, to perform the tilling, seeding, and mowing services required by the government in 1998 and 2000, and that the government paid for a significant portion of the materials used in these activities. However, there is no evidence that Redlin performed any activity on the land in either 2006 or 2007–the only two tax years at issue. Rather, Morehouse's activities in 2006 and 2007 with respect to CRP contracts were limited solely to driving around the CRP properties a few times each year to ensure they complied with the contracts.

a notice of deficiency for 2006 and 2007. The notice stated the CRP payments should have been reported as income on a Schedule F, Profit or Loss From Farming, and were thus unreported self-employment income, which should have been taxed.

The Morehouses petitioned the Tax Court for review of the Commissioner's determination that the CRP payments were taxable as income from self-employment. The Tax Court ultimately sustained the Commissioner's determination. In reaching this decision, the Tax Court first concluded Morehouse was "engaged in the business of participating in the CRP . . . with the primary intent of making a profit" and that there was a sufficient nexus between this business and the CRP payments, thus categorizing the payments as net earnings from self-employment.[4] 26 U.S.C. § 1402(a). The Tax Court also rejected the assertion that CRP payments were rentals from real estate under 26 U.S.C. § 1402(a)(1) and should thus be excluded from Morehouse's net earnings from self-employment. The Tax Court instead concluded

---

[4]The dissent seemingly argues that we should conclude that Morehouse was in the trade or business of farming because in order to qualify for CRP payments he had to certify that he was an eligible person actively engaged in farming operations on eligible land. This argument, however, runs directly contrary to the Tax Court's longstanding position that a determination by the USDA that an individual was actively engaged in farming "is not a determination for Federal income tax purposes that [Morehouse was] actively engaged in a trade or business." Hasbrouck v. Comm'r, T.C.M. 1998-249, 1998 WL 373337, at *12, aff'd without published opinion, 189 F.3d 473 (9th Cir. 1999). Here, the Tax Court summarily (and quite properly) rejected the Commissioner's novel argument that Morehouse was actually engaged in the trade or business of conducting an environmentally friendly farming operation. The record indicates that Morehouse never personally farmed the CRP Properties and that he tilled and fertilized the land so that he could establish grass covering of which he could make no economic use. We suspect, respectfully, that the Commissioner's characterization of Morehouse's activities as even remotely resembling a "farming operation" would be met with a fair modicum of skepticism by anyone who has carried on (or closely observed) such an enterprise.

CRP payments were proceeds from Morehouse's own use of his land and thus did not constitute rent. Morehouse appeals.

## II. DISCUSSION

An order of the Tax Court "is subject to the same review . . . as a similar order of a district court." 26 U.S.C. § 7482(a)(3). The Tax Court's "conclusions of law are reviewed de novo and findings of fact are upheld unless clearly erroneous." Estate of Korby v. Comm'r, 471 F.3d 848, 852 (8th Cir. 2006). The question of whether CRP payments are "net earnings from self-employment" within the meaning of 26 U.S.C. § 1402(a) is a mixed question of law and fact that we review de novo. Milligan v. Comm'r, 38 F.3d 1094, 1097 (9th Cir. 1994).

Section 1402 of the Internal Revenue Code, which imposes a tax on the "self-employment income of every individual," was designed to provide social security benefits to self-employed persons. See Bot v. Comm'r, 353 F.3d 595, 596 (8th Cir. 2003). We have previously recognized that self-employment tax provisions "are broadly construed to favor treatment of income as earnings from self-employment." Id. at 599.

"[S]elf-employment income means the net earnings from self-employment derived by an individual." 26 U.S.C. § 1402(b). "[N]et earnings from self-employment means the gross income derived by an individual from any trade or business carried on by such individual." Id. § 1402(a) (internal quotation omitted). The "derived from" requirement "necessitates a nexus between the income and the trade or business actually carried on by the taxpayer. That is, the trade or business activity must give rise to the income." Bot, 353 F.3d at 599. Section 1402(a)(1) excludes from the definition of "net earnings from self-employment" several types of income, including "rentals from real estate" and CRP payments made to "individuals receiving benefits under section 202 or 223 of the Social Security Act." Thus, this

-5-

statutory language sheds little, if any, light on whether a particular CRP contract payment, especially one made to a non-farmer, constitutes "net earnings from self employment."

The CRP is the current version of a long line of federal soil conservation programs, and is so substantially similar to its predecessor, the Soil Bank Act, 7 U.S.C. §§ 1801-1837 (repealed 1965), that we have referred to it as the "Son of Soil Bank." Petersen v. Chater, 72 F.3d 675, 677 (8th Cir. 1995).

In Revenue Ruling 60-32, 1960-1 C.B. 23 (1960), the IRS concluded that soil bank payments made to persons who did not operate or materially participate in a farming operation were "not to be included in determining net earnings from self-employment." Soil bank payments to farmers, however, were to be treated as self-employment income derived from their farming business. Id. Although Revenue Ruling 60-32 did not explain why the IRS differentiated between farmers and non-farmers, a subsequent revenue ruling indicated the IRS viewed soil bank payments to non-farmers as rental income. Rev. Rul. 65-149, 1965-1 C.B. 434 (1965).

Although not binding on this court, "when a Revenue Ruling reflects a longstanding and reasonable interpretation of the agency's regulations, the Ruling attracts substantial judicial deference." David E. Watson, P.C. v. United States, 668 F.3d 1008, 1017 n.6 (8th Cir. 2012) (internal quotation omitted). Given the significant overlap between the CRP and the soil bank program "and because the judgment expressed in Revenue Ruling 60-32 is not an unreasonable" one, we find Revenue Ruling 60-32 persuasive. Wuebker v. Commissioner, 205 F.3d 897, 903 (6th Cir. 2000). We thus hold that CRP payments made to non-farmers constitute rentals from real estate for purposes of § 1402(a)(1) and are excluded from the self-employment tax. See Rev. Rul. 65-149 (reaching same conclusion with respect to soil bank payments).

We reject as erroneous the Commissioner's attacks on Revenue Ruling 60-32 based on Wuebker and IRS Notice 2006-108, 2006-2 C.B. 1118 (2006). The taxpayers in Wuebker were active farmers who claimed their CRP payments constituted rentals from real estate. 205 F.3d at 902. The Tax Court found in favor of the taxpayers, but the Sixth Circuit reversed. Id. at 904-05. Noting it was a close question, the Wuebker court concluded that CRP payments to farmers did not fall within the "ordinary or natural" meaning of the phrase "rentals from real estate." Id. at 903-904.[5]

Although not abundantly clear, the Wuebker court's determination seemed to rest on its conclusion that, because the taxpayers' maintenance obligations under their CRP contracts were intrinsically similar to activities performed in their active farming operation–"tilling, seeding, fertilizing, and weed control"–these obligations did not rise to the level of "occupancy or use" by the government. Id. The court further presumed the IRS took a similar position in Revenue Ruling 60-32 when it concluded soil bank payments to active farmers constituted self-employment income under § 1401. Id. at 905. However, the court neither recognized nor rejected the IRS's position in Revenue Ruling 60-32 that similar payments to non-farmers were not self-employment income.

In 2006, the IRS submitted for comment a proposed revenue ruling that would have dramatically expanded Wuebker's reach. See Notice 2006-108. With little analysis, the proposed revenue ruling concluded CRP payments to non-farmers were not rentals from real estate and should be treated as income from self-employment. Notice 2006-108 further stated that, if adopted, the proposed revenue ruling would render obsolete Revenue Ruling 60-32. The IRS has not formally adopted the

---

[5]The Wuebker court defined "rent" as "'[c]onsideration paid . . . for the use or occupancy of property.'" 205 F.3d at 904 (alterations in original) (quoting Black's Law Dictionary 1299 (7th ed. 1999).

proposed revenue ruling, perhaps because the Commissioner has come to understand Wuebker's reasoning concerning this particular issue, especially when applied to non-farmers, is problematic. Neither does the proposal represent the agency's longstanding treatment of land conservation payments made to non-farmers. See Rev. Rul. 60-32; Rev. Rul. 65-149. We thus afford it no deference. See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220 (2001).

In arriving at our conclusion, we embrace the agency's longstanding position that land conservation payments made to non-farmers constitute rentals from real estate and are excluded from the self-employment tax. See Rev. Rul. 60-32; Rev. Rul. 65-149. While CRP contracts may require farmers to conduct a small subset of activities similar to those used in a portion of their general farming operations, Wuebker, 205 F.3d at 903, the same cannot be said for non-farmers. The only reason they even indirectly engage in or arrange for any "tilling, seeding, fertilizing, and weed control" activities on their CRP land is because the agreement with the government requires them to do so. Id.

In addition, CRP contracts often reserve for the government a right of entry to inspect the CRP lands. As an example, the Wuebker contract states:

> Representatives of CCC shall have the right of access to [the] land subject to this contract and to examine any other lands or records under the participant's control for the purpose of determining land classification and erosion rates and for the purpose of determining whether there is compliance with the terms and conditions of this contract.

205 F.3d at 900 (alteration in original).

From the record it appears that similar rights and responsibilities were incorporated into the Morehouse agreement. Indeed, the record discloses that the

-8-

government, whether by contractual right or otherwise, physically inspected the CRP properties nearly as often as Morehouse did. These entries, coupled with the significant "tilling, seeding, fertilizing, and weed control" work required by the CRP contracts[6] reveal the government likely had more physical possession for its own land conservation "uses" than Morehouse did.[7] Accordingly, we hold the 2006 and 2007 CRP payments were "consideration paid [by the government] for use [and occupancy]

---

[6]The dissent correctly identifies that the CRP contracts obligated Morehouse to develop and maintain certain grass coverings on the CRP Properties and to comply with certain weed control standards. The dissent fails, however, to note that at trial, counsel for the IRS represented that if Morehouse did not fulfill these requirements, the USDA could arrange for any needed work to be completed "on his behalf" and could charge Morehouse a per acre fee for the work. Although the record is somewhat murky regarding what authority the USDA actually had to enter and use the CRP Properties, this representation nonetheless suggests that, rather than merely compensating Morehouse for his own use of the properties, the CRP contracts actually entitled the USDA to make certain uses of the properties, whether through Morehouse's actions or its own.

[7]The Commissioner singularly focuses on the benefits Morehouse received from the CRP contracts while ignoring the broad public purposes served by the CRP and its predecessor conservation programs. The CRP is a mechanism by which Congress prevents harmful soil erosion, improves air and water quality, provides habitat for animal and plant populations of significant ecological value, and protects "the agricultural production capability for future generations." 16 U.S.C. § 3831. Congress has charged the Secretary of Agriculture to carry out these public purposes via CRP contracts that compensate private landowners for devoting their land to these purposes. Id. The Secretary is also required to jointly "share the cost of carrying out the conservation measures and practices" on the land. Id. § 3833(a)(1). Congress has charged the Secretary with ensuring that vast portions of highly erodible cropland are removed from production and transformed into conservation reserves. That private landowners participate in this process does not change the fact that the government is using their land for its own purposes.

of [Morehouse's] property" and thus constituted rentals from real estate fully within the meaning of § 1402(a)(1). Id. at 904.[8]

## III. CONCLUSION

For the reasons set forth above, we reverse and remand to the Tax Court with instructions to enter judgment in favor of the Morehouses.

GRUENDER, Circuit Judge, dissenting.

The court concludes that the CRP payments to Morehouse were not taxable as self-employment income because the CRP payments constituted "rentals from real estate" under 26 U.S.C. § 1402(a)(1). *Ante* at 8-9. I respectfully disagree. I would follow the Sixth Circuit's persuasive interpretation of "rentals from real estate" as it relates to CRP payments, *see Wuebker v. Comm'r*, 205 F.3d 897, 903-05 (6th Cir. 2000), which accords with the Internal Revenue Service's most recent explanation of this statutory phrase, *see* I.R.S. Notice 2006-108, 2006-2 C.B. 1118.

Morehouse makes two arguments to support his assertion that his CRP payments were not taxable as self-employment income. First, Morehouse argues that the CRP payments were not net earnings from self-employment under § 1402(a).

---

[8]We note in passing that Morehouse's CRP contracts bear a striking resemblance to land conservation easements. A "land conservation easement" is "[a]n easement arising from an agreement between a land-owner and a land trust to provide for the protection of the land in its natural state while perhaps also allowing the property to be used for agricultural or low-impact recreational activities." Black's Law Dictionary 623 (10th ed. 2014). Here, it appears the CRP contracts may have functioned in practice as ten-year long "land conversation easements" with the government functioning as the trustee in enforcement of the contract obligations.

-10-

Second, Morehouse contends that, even if the CRP payments were net earnings from self-employment, they nonetheless were excluded therefrom as rentals from real estate under § 1402(a)(1). The court's reversal of the Tax Court's judgment rests solely on this latter ground. *Ante* at 7-9. Because I agree with the Commissioner that the CRP payments to Morehouse constituted net earnings from self-employment and that the CRP payments were not rentals from real estate, I would affirm the Tax Court's judgment.

The Internal Revenue Code imposes self-employment tax on the "net earnings from self-employment derived by an individual . . . during any taxable year." 26 U.S.C. §§ 1401(a), 1402(b). The term "net earnings from self-employment" is defined as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed." § 1402(a). "The 'derived from' requirement necessitates a nexus between the income and the trade or business actually carried on by the taxpayer." *Bot v. Comm'r*, 353 F.3d 595, 599 (8th Cir. 2003). To carry on a trade or business, "the taxpayer must be involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987). Treasury regulations further provide that a taxpayer's trade or business "must be carried on by the individual, either personally or through agents or employees." Treas. Reg. § 1.1402(a)-2(b). Consequently, the CRP payments to Morehouse were net earnings from self-employment if they were derived from a trade or business carried on by Morehouse or his agent, keeping in mind that "[t]he self-employment tax provisions are broadly construed to favor treatment of income as earnings from self-employment." *Bot*, 353 F.3d at 599.

Morehouse contends that he did not carry on a trade or business because his activities with respect to his CRP contracts were neither continuous nor regular. Whether a taxpayer is engaged in a trade or business is a question of fact that we review for clear error. *Id.* Morehouse's personal activities with respect to his CRP

contracts included enrolling his property in the CRP, making annual certifications that his property complied with the CRP, purchasing seeds for his property on two occasions and having them shipped to his property, seeking and receiving cost-sharing payments for seeding and weeding activities, choosing to participate in the emergency haying of his property on various occasions, and making several trips each year to check on his property. Morehouse also hired Wallace Redlin to perform the physical labor required by the CRP contracts, which the court recognizes could entail "significant 'tilling, seeding, fertilizing, and weed control' work." *Ante* at 8. The Tax Court found, and Morehouse does not dispute, that Redlin was Morehouse's agent, meaning that Redlin's activities were attributable to Morehouse for purposes of determining whether Morehouse carried on a trade or business. *See* Treas. Reg. § 1.1402(a)-2(b); *Bot*, 353 F.3d at 601. In addition, Morehouse also represented to the government that he was an eligible person actively engaged in farming operations on eligible land, that he would provide all of the active personal management for the farming operation, and that he would hire all of the active personal labor needed in the farming operation. We previously have held taxpayers to their representations in determining whether they were carrying on a trade or business. *See Bot*, 353 F.3d at 601-02 ("Despite [the taxpayers'] assertion that they bought the units of participation as an investment, the program operated on the basis that they were producers or owners of the [goods] delivered under the program . . . and that . . . their agent [acted on their behalf]. The [taxpayers] should be held to their representations."). Considering the continuing obligations and monitoring required by the CRP contracts, Morehouse and Redlin's compliance activities, and Morehouse's representations in placing his property in the CRP, it cannot be said that the Tax Court committed a clear error by finding that Morehouse's activities were sufficiently continuous and regular to carry on a trade or business.[9]

---

[9]This conclusion is fully consistent with the IRS's recent views on this issue. *See* I.R.S. Notice 2006-108, 2006-2 C.B. 1118 ("Although more extensive activities are required [of the landowner or his agent] at the beginning of the [CRP] contract

This brings me to the issue on which the court and I disagree: whether the CRP payments to Morehouse were rentals from real estate. If the CRP payments qualify as rentals from real estate, then they are excluded from Morehouse's net earnings from self-employment. *See* 26 U.S.C. § 1402(a)(1). The court's principal reason for finding that the CRP payments to Morehouse were rentals from real estate is Revenue Ruling 60-32, 1960-1 C.B. 23, in which the IRS analyzed whether payments to a landowner under a predecessor of the CRP were taxable as net earnings from self-employment. In this revenue ruling and another that followed it, the IRS defined rentals from real estate to include, as relevant here, payments to a landowner who does not operate a farm personally or through agents or employees. *Id.*; Rev. Rul. 65-149, 1965-1 C.B. 434. However, as the court notes, the IRS effectively abandoned this position in 2006 by issuing a proposed revenue ruling in which the IRS concluded that CRP payments to a non-farmer, like Morehouse, are not rentals from real estate. *See* I.R.S. Notice 2006-108, 2006-2 C.B. 1118. The IRS issued this proposed revenue ruling in response to, among other things, the Sixth Circuit's opinion in *Wuebker*, *id.*, which held that CRP payments to farmers did not constitute rentals from real estate, 205 F.3d at 903-04. In adopting *Wuebker*'s rationale and applying it to both farmers and non-farmers, the IRS recognized that this notice would render Revenue Ruling 60-32 obsolete. I.R.S. Notice 2006-108, 2006-2 C.B. 1118 ("Revenue Ruling 60-32 is obsoleted."). Consequently, we are left to reconcile the IRS's conflicting views.

The court resolves this conflict by "embrac[ing]" the IRS's interpretation from Revenue Ruling 60-32 and according no deference to Notice 2006-108. *Ante* at 8. Although I would grant limited deference to Notice 2006-108 as the IRS's understanding of § 1402(a)(1) in light of *Wuebker*, I agree with the court that our

---

term than later, the obligation to perform activities extends throughout the ten-year period, giving participation in [the] CRP the continuity and regularity necessary to be considered a trade or business.").

deference must be tempered by the IRS's inconsistent views over time and by the IRS's failure to adopt this notice as a formal revenue ruling. *See Esden v. Bank of Boston*, 229 F.3d 154, 169 n.19 (2d Cir. 2000) (finding that IRS notice can be "entitled to respect" because it constitutes a "body of experience and informed judgment" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Skidmore*, 323 U.S. at 140 (noting that level of deference depends upon, among other factors, "consistency with earlier and later pronouncements"); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (explaining that, under *Skidmore*, deference can range from "great respect at one end to near indifference at the other" (internal citation omitted)).

However, even according no deference to Notice 2006-108, I agree with its interpretation of the rentals-from-real-estate exclusion. Because the term "rentals from real estate" is not defined in the Internal Revenue Code, it must be interpreted "in accordance with its ordinary or normal meaning," *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994), with the qualification that, as an exclusion from net earnings from self-employment, the rentals-from-real-estate exclusion must be narrowly construed, *Wuebker*, 205 F.3d at 903; *Johnson v. Comm'r*, 60 T.C. 829, 833 (1973). In *Wuebker*, the Sixth Circuit defined "rentals from real estate" as "[c]onsideration paid . . . for the use or occupancy of property." *Wuebker*, 205 F.3d at 904 (alteration and omission in original) (quoting Black's Law Dictionary 1299 (7th ed. 1999) (defining "rent")). While the court adopts a similar definition, the court concludes that the CRP payments to Morehouse compensated him both for the government's occupancy and its use of Morehouse's property. *Ante* at 8. For the reasons explained by the Sixth Circuit, I respectfully disagree. *See Wuebker*, 205 F.3d at 904.

Beginning with the issue of the government's occupancy of Morehouse's property, a handful of governmental ingresses for monitoring does not amount to "occupancy" as that term is normally understood. *See* Webster's Third New

-14-

International Dictionary 1561 (2002) (defining "occupy" as "to reside in as an owner or tenant"). The court, however, adopts an almost unbounded view of occupancy, even though Morehouse did not argue that the government occupied his property and even though the *Wuebker* court, including the dissenting judge, expressly declined to endorse such an expansive interpretation of occupancy. *See Wuebker*, 205 F.3d at 905 (Jones, J., dissenting) ("[T]he [government] did not possess or occupy the [taxpayers'] property in the traditional sense that gives rise to a tenant-landlord relationship.").

Turning to whether the government "used" Morehouse's property, the court equates the tasks required of Morehouse under the CRP contracts and the government's compliance checks of his property with the use of Morehouse's property by the government. *Ante* at 8-9. Although I agree with the Sixth Circuit that "[w]hether the CRP payments constitute consideration for the 'use' of [a taxpayer's] land is a close[] question," I also agree that "such an argument impermissibly stretches the plain meaning of the term 'use,' especially in light of the narrow construction required of the rentals-from-real-estate exclusion." *Wuebker*, 205 F.3d at 904; *see* Webster's Third New International Dictionary 2523-24 (2002) (defining "use" as "to put into action or service"). Under the CRP, Morehouse, not the government, implemented the required work on his property.[10] In addition, Morehouse enjoyed uninterrupted and unfettered access to his property. Under these

---

[10]As evidence that the government "used" Morehouse's property, the court points to the IRS's assertion from trial that the government could arrange for Morehouse's CRP requirements to be completed on his behalf. *Ante* at 9 n.6. The court correctly acknowledges that the record is "somewhat murky" regarding whether the government actually possessed this authority. The court has identified no provision in Morehouse's CRP contracts that granted this unilateral right to the government. Moreover, when Morehouse violated one of his CRP contracts by using part of his property as a gravel quarry, the government simply removed the property from the CRP and required Morehouse to refund the relevant CRP and cost-sharing payments, plus interest and liquidated damages.

circumstances, it cannot be said that Morehouse's checklist of tasks along with the government's sporadic entries onto his property somehow translated into "use" of Morehouse's property by the government. As the Sixth Circuit recognized, "[t]he essence of the [CRP] is to prevent participants from farming the property and to require them to perform various activities in connection with the land, both at the start of the program and continuously throughout the life of the contract, with the government's access limited to compliance inspections." *Wuebker*, 205 F.3d at 904. Consequently, the CRP merely allowed the government to replace the income that Morehouse could have received from using his property for farming with income from Morehouse using his property to achieve a public benefit.

Because the CRP payments to Morehouse were net earnings from self-employment under § 1402(a) and were not rentals from real estate under § 1402(a)(1), I would affirm the Tax Court's judgment. I therefore respectfully dissent.[11]

_____

---

[11] While I respectfully disagree with the court's reading of the rentals-from-real-estate exclusion, its rationale may come with a short shelf life due to an intervening amendment to the Internal Revenue Code. After Morehouse received the CRP payments at issue, Congress amended § 1402(a)(1) to specify that CRP payments to an individual who receives old-age and survivors insurance benefits or disability insurance benefits are rentals from real estate. *See* Food, Conservation, and Energy Act of 2008 ("FCEA"), Pub. L. No. 110-246, § 15301(a), 122 Stat. 1651, 2263 (2008). Although the court refers to amended § 1402(a)(1) in its discussion of the statutory background, *ante* at 5, this amendment is not applicable here. The amendment governs CRP payments made after December 31, 2007, FCEA § 15301(c), 122 Stat. at 2263, and neither party disputes the Tax Court's finding of fact that the government made the CRP payments at issue before that date. Consequently, whether CRP payments that the government made after December 31, 2007 or currently makes to a non-farmer qualify as rentals from real estate under amended § 1402(a)(1) is a question that the court's decision does not resolve.