T.C. Summary Opinion 2011-48

UNITED STATES TAX COURT

AL C. AND YELENA ALEXANDER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 943-10S.                    Filed April 12, 2011.

<u>Raymond H. Siderius</u>, for petitioners.

<u>Melanie E. Senick</u>, for respondent.

ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7463 of the Internal Revenue Code in
effect when the petition was filed.[1]  Pursuant to section
7463(b), the decision to be entered is not reviewable by any

---

[1]  Unless otherwise indicated, all subsequent section
references are to the Internal Revenue Code in effect for the
years in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

other court, and this opinion shall not be treated as precedent for any other case.

Petitioners received a notice of deficiency for 2006, 2007, and 2008 in which respondent determined: (1) Deficiencies in income taxes of $8,535, $10,814, and $9,876, respectively, and (2) accuracy-related penalties under section 6662(a) of $448, $490.60, and $199.80, respectively. The issues for decision are:

(1) Whether petitioners may exclude from gross income the receipt of certain payments as foster care payments under section 131. We hold that they may not;

(2) whether petitioners are entitled to unreimbursed employee business expenses in an amount greater than that allowed or conceded by respondent. We hold that petitioners are so entitled for 2006 but not otherwise;

(3) whether petitioners are liable for the accuracy-related penalties under section 6662(a). We hold that they are.

## Background

Some of the facts have been stipulated, and they are so found. We incorporate by reference the parties' stipulation of facts and accompanying exhibits. Petitioners resided in the State of Washington when the petition was filed.

At all times relevant, Mrs. Alexander was an elementary school teacher and Mr. Alexander was a high school math and physics teacher. During each of the years in issue, in addition

to his teaching position, Mr. Alexander was also a judo instructor.

In 2006, Mr. Alexander participated in the National Board Certified Teacher process. Although Mr. Alexander was not successful in his bid for national certification at that time, he paid an assessment fee of $2,500 as a result of this pursuit.

During each of the years in issue, Mr. Alexander's parents, Konstantin and Tatiana, lived in petitioners' home. Petitioners were qualified individual providers for the Washington State Department of Social and Health Services (DSHS) and provided services for Konstantin and Tatiana under the Washington State Medicaid Personal Care (MPC) program.[2]

The DSHS employment guide for individual providers states that "The person you provide services for is referred to as your employer". The employment guide further states that "The tasks you will do for your employer support his or her well-being and help him or her continue to live as independently as possible at home." The employer is a client of DSHS, and DSHS coordinates and pays for the services of the individual provider. At the end of each month, petitioners were required to submit timesheets to

---

[2] The services petitioners provided to Konstantin and Tatiana were nonmedical and included assistance with daily living activities such as "eating, bathing, transfer (i.e. moving from a bed to a chair), bed mobility (i.e. position), locomotion (i.e. walking or moving around), medication management, and assistance with using the toilet."

DSHS for the services provided to Mr. Alexander's parents during that month. The employment guide states that if an individual provider wants Federal income tax withheld, the individual provider must submit a Form W-4, Employee's Withholding Allowance Certificate, to DSHS.

A DSHS case manager is assigned to, inter alia, assist DSHS clients with developing a plan of care that documents the client's choice of services and qualified providers. Konstantin's case manager, Dakarie Johndro (Ms. Johndro), stated that the MPC program is "an in-home program" designed to "help clients remain as independent as possible * * * so they can avoid a nursing home."[3] Ms. Johndro also stated that case managers do not interview the potential individual providers because the case managers are "not the ones hiring * * * [the individual providers]", but rather the clients hire the individual providers. Ms. Johndro's assessment report for Konstantin dated August 18, 2010, indicates that Konstantin was "informed of the settings in which he can receive care and he continues to choose independent living without 24 hour care." Furthermore, Ms. Johndro stated that Konstantin was not placed in petitioners' home by DSHS.

---

[3] There is a dearth of evidence regarding Tatiana in the record. However, the parties proceeded on the basis that Ms. Johndro is the case manager for Tatiana and that the facts regarding Konstantin are equally applicable to Tatiana.

For 2006, 2007, and 2008, petitioners received Forms W-2, Wage and Tax Statement, from DSHS of $16,948, $28,052, and $31,088, respectively. All of the Forms W-2 from DSHS reflected withholding for Social Security and Medicare taxes, but none reflected any Federal income tax withholding.

For each of the years at issue, petitioners included the amount reflected on the Forms W-2 in gross income but then deducted the full amount on line 21 of their tax return, claiming that the amount was excludable from gross income pursuant to section 131.[4]

For 2006, 2007, and 2008, petitioners deducted amounts on Schedule A, Itemized Deductions, for unreimbursed employee business expenses of $16,993, $21,439, and $6,656, respectively.

In the notice of deficiency respondent disallowed the exclusions from income pursuant to section 131 and most of the deductions claimed for unreimbursed employee business expenses. Respondent also determined that petitioners are liable for the accuracy-related penalties under section 6662(a).

---

[4] For 2006, petitioners actually received $26,149 but only reported $16,948 in their gross income. Petitioners, however, excluded $26,149 on line 21 of their 2006 return. Nonetheless, the discrepancy in these amounts is not at issue in this case.

## Discussion

### A. Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Under section 7491(a)(1), the burden of proof may shift from the taxpayer to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability. Petitioners have not alleged that section 7491(a) applies, nor did they introduce a sufficiency of evidence to invoke that section; therefore, the burden of proof remains on petitioners.

Exclusions and deductions are a matter of legislative grace and are narrowly construed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Consequently, the taxpayer bears the burden of proving that he or she is entitled to any deduction or exclusion claimed. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943).

### B. Qualified Foster Care Payments

Section 61(a) provides generally that "gross income means all income from whatever source derived". Gross income is an inclusive term with broad scope, designed by Congress to "exert

* * * 'the full measure of its taxing power.'" Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955) (quoting Helvering v. Clifford, 309 U.S. 331, 334 (1940)). Section 61(a)(1) specifically includes compensation for services.

Section 131(a) provides that gross income shall not include "qualified foster care payments." A "qualified foster care payment" as described in section 131(b)(1) is any amount:

(A) which is paid by--

(i) a State or political subdivision thereof, or

(ii) a qualified foster care placement agency, and

(B) which is--

(i) paid to the foster care provider for caring for a qualified foster individual in the foster care provider's home, or

(ii) a difficulty of care payment.[5]

As relevant herein, a "qualified foster individual" is described in section 131(b)(2) as any individual living in a foster family home in which the individual was "placed by * * * an agency of a State or a political subdivision thereof". Sec. 131(b)(2)(A).

The amounts at issue can be qualified foster care payments only if they were paid to petitioners as foster care providers for qualified foster individuals. See sec. 131(b)(1)(B)(i). To

---

[5] Difficulty of care payments as described in sec. 131(c) are not at issue in this case.

be qualified foster individuals, Mr. Alexander's parents must (1) live in a "foster family home" and (2) have been "placed by" an agency of the State or political subdivision thereof in the foster family home.  See sec. 131(b)(2)(A).

Foster Family Home

First, neither section 131 nor its legislative history defines "foster family home", and there are no regulations addressing this statute.  Under Washington State law a "foster family home" is

> an agency which regularly provides care on a twenty-four hour basis to one or more children, expectant mothers, or persons with developmental disabilities in the family abode of the person or persons under whose direct care and supervision the child, expectant mother, or person with a developmental disability is placed; [Wash. Rev. Code Ann. sec. 74.15.020(1)(e) (West Supp. 2001).]

Petitioners have not demonstrated that they operated a foster family home within the meaning of Wash. Rev. Code Ann. sec. 74.15.020(1)(e).

Under Washington State law, an adult family home is "a residential home in which a person or persons provide personal care, special care, room, and board to more than one but not more than six adults who are not related by blood or marriage to the person or persons providing the services."  Wash. Rev. Code Ann. sec. 70.128.010(1) (West 2002 & Supp. 2011).  Regardless of whether an "adult family home" is a "foster family home" under section 131, petitioners are related to Mr. Alexander's parents;

thus petitioners' home does not qualify as an "adult family home" under Wash. Rev. Code Ann. sec. 70.128.010(1).

In addition, the MPC program in which Mr. Alexander's parents participated is an in-home program designed to "help clients remain as independent as possible" and to avoid a nursing home. Ms. Johndro, the case manager, indicated in her assessment report for Konstantin that he chose "independent living without 24 hour care." Thus, the MPC program treated petitioners' home as Mr. Alexander's parents' home as opposed to a foster family home.

In sum, petitioners have not shown that they operated a foster family home within the meaning of section 131.

"Placed by" a State Agency

Second, the qualified foster individual must be "placed by * * * an agency of a State or a political subdivision thereof". Sec. 131(b)(2)(A). "As a general matter, if the language of a statute is unambiguous on its face, we apply the statute in accordance with its terms, without resort to extrinsic interpretive aids such as legislative history." See, e.g., Garber Indus. Holding Co. v. Commissioner, 124 T.C. 1, 5 (2005), affd. 435 F.3d 555 (5th Cir. 2006); see also Micorescu v. Commissioner, T.C. Memo. 1998-398 (stating "that the intent of Congress as expressed in the pertinent legislative history comports with the plain meaning of the language in section

131."). As previously stated, the MPC program in which Mr. Alexander's parents participated is an in-home program designed to "help clients remain as independent as possible". Ms. Johndro stated that Mr. Alexander's parents were not placed in petitioners' home by DSHS, and her assessment report for Konstantin further states that Konstantin "continues to choose independent living without 24 hour care." Finally, Ms. Johndro stated and the individual provider employment guide also states that an employer-employee relationship was established when Mr. Alexander's parents selected petitioners to be their individual providers. Hence, Mr. Alexander's parents were not "placed by * * * an agency of a State or a political subdivision thereof" in petitioners' home within the meaning of section 131.

Because petitioners did not operate a foster family home and because Konstantin and Tatiana were not placed by an agency of the State in petitioners' home, Mr. Alexander's parents are not qualified foster individuals.

Although we commend petitioners for the support and compassion they have shown Mr. Alexander's parents, we cannot grant them the relief they seek. Accordingly, we hold that petitioners are not entitled to exclude from gross income the receipt of payments under Washington's MPC program as foster care payments under section 131 for the years at issue.

C.  Unreimbursed Employee Business Expenses

Section 162 generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  The term "trade or business" as used in section 162(a) includes the trade or business of being an employee.  Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970).  The determination of whether an expenditure satisfies the requirements for deductibility under section 162 is a question of fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  In general, an expense is ordinary if it is considered normal, usual, or customary in the context of the particular business out of which it arose, Deputy v. du Pont, 308 U.S. 488, 495 (1940), and an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business, Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).  On the other hand, section 262(a) generally disallows a deduction for personal, living, or family expenditures.

Respondent has allowed or conceded that petitioners are entitled to deduct unreimbursed employee business expenses for 2006, 2007, and 2008 of $3,573.40, $4,829.00, and $3,608.80, respectively.[6]

_____

[6]  For each year respondent allowed or conceded $1,688 for union dues and $641 for mileage.  For 2006, respondent also

(continued...)

Petitioners have demonstrated that they are entitled to an additional deduction for 2006 of $2,500 for Mr. Alexander's original National Board Certified Teacher certification process. Beyond this additional deduction for 2006, petitioners have not established that they are entitled to unreimbursed employee business expenses in any greater amounts. Thus, we hold that petitioners are entitled to an additional deduction of $2,500 for unreimbursed employee business expenses for 2006 but are not otherwise entitled to deductions for unreimbursed employee business in excess of the amounts previously allowed or conceded by respondent for any of the years in issue.

D. <u>Section 6662 Penalty</u>

Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the amount of any underpayment attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with tax laws, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec.

---

[6](...continued) allowed or conceded $842.00 for airfare and car rental for Mr. Alexander's AP Institute Training in Honolulu, HI, and $402.40 for airfare for Mr. Alexander's travel for judo. For 2007, respondent also allowed or conceded $2,500 for Mr. Alexander's National Board Certified Teacher retake process fees. For 2008, respondent also allowed or conceded $884.81 for airfare and car rental for Mr. Alexander's AP International Institute in Honolulu, HI, and $394.99 for airfare related to Mr. Alexander's travel for judo.

6662(c).  Negligence also includes any failure to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and the taxpayer acted in good faith with respect to, the underpayment.  Sec. 1.6664-4(a), Income Tax Regs.  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.  Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability for such year.  Id.

With respect to a taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  See id. at 447; see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Respondent determined the accuracy-related penalties only on the disallowance of petitioners' deductions for unreimbursed employee business expenses. Respondent has proven, and has therefore discharged his burden of production under section 7491(c), that petitioners failed to properly substantiate the disallowed items. See sec. 1.6662-3(b)(1), Income Tax Regs.

Petitioners have not met their burden of persuasion with respect to reasonable cause and good faith.[7] Thus, on the record before us, we are unable to conclude that petitioners acted with reasonable cause and in good faith within the meaning of section 6664(c)(1). Accordingly, petitioners are liable for the accuracy-related penalty under section 6662(a) on that part of the underpayment for each year attributable to disallowed deductions for unreimbursed employee business expenses.

## Conclusion

We have considered all of the arguments made by petitioners, and, to the extent that we have not specifically addressed them, we conclude that they do not support a result contrary to that reached herein.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[7] At trial, petitioners had little to say about this issue other than to imply that it was not conceded.